UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Linda C. Weaver, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) No. 14 CV 50103 |
| | ) Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda C. Weaver brings this action under 42 U.S.C. §405(g), appealing the denial of social security disability benefits. As explained below, the decision is affirmed.

## BACKGROUND

The pivotal event in this case is the suicide of plaintiff's husband on October 27, 2009. He hung himself in the family garage and was first found by plaintiff. R. 303, 355. Plaintiff has identified this date as the onset of her disability. It is also the date she quit working in her job as a nurse's assistant. R. 88. After the suicide, plaintiff experienced significant mental symptoms, including anxiety, depression, grief, and panic attacks. Dkt. #14 at 3. This was the first time in her life she had panic attacks, and it does not appear that she had any significant mental health problems before this time. R. 355. She was then 57 years old. R. 341.

In addition to these psychological problems, which comprise half of her claim for disability, plaintiff also alleges that she suffers from recurrent muscle spasms, which she refers to as dystonia attacks. These began before her husband's suicide. In July 2009, plaintiff began treatment with Dr. Malgorzata Oczko-Walker, a neurologist. An MRI was taken but it was normal. No signs of Parkinson's were detected. Dr. Oczko-Walker tentatively diagnosed plaintiff

1

with "a mild left cervical dystonia and jaw opening dystonia," and ordered blood tests. R. 342. These tests showed elevated levels of copper, manganese, and cadmium. There was some discussion about whether the high metal levels could be the cause of plaintiff's jaw dystonia, although it does not appear that any definitive conclusion was ever reached about this issue.[1]

Over the latter half of 2009 and through the first half of 2010, plaintiff was treated by Dr. Oczko-Walker who prescribed different combinations of drugs, such as Artane and Valium, to treat the jaw dystonia. During this time, plaintiff moved to a new house because there was a concern that drinking well water at her old residence caused the high metal levels. Eventually, sometime in 2010, the metal levels returned to normal except for the cadmium levels, which Dr. Oczko-Walker speculated may have been caused by plaintiff's smoking. R. 332. In February 2010, Dr. Oczko-Walker noted that plaintiff's mouth movements were "somewhat better but still persistent," and that plaintiff reported that "stress aggravated it." R. 328. She recommended a psychiatric evaluation as soon as possible. R. 329.

On March 18, 2010, plaintiff went to the emergency room complaining about having a panic attack. She told the doctors that she had "a very rough month" because just that day she learned that her sister-in-law's father committed suicide and two weeks earlier that a cousin had been killed by an intruder. She also stated that "whenever she has these panic attacks, she will shake all over and will just have to get into a closet until someone gets her out." R. 303. One doctor noted that although plaintiff had "some tremors in her head and upper body," that "whenever she has purposeful movement, the tremors would cease." R. 303. She was diagnosed

---

[1] At some point, an autopsy of plaintiff's husband revealed that—according to plaintiff—he "had a large amount of heavy metal, which predisposed him to suicide." R. 303. Plaintiff told therapists that she often ruminated about whether she could have done more to address the problem of heavy metals and maybe prevented her husband's suicide. The Court also notes that, although not commented on by plaintiff in her briefs, she also told one therapist that she wondered whether her husband's suicide was caused by recent marital problems. *See* R. 446. Whatever may have been the cause is not important for purposes of addressing plaintiff's arguments here.

2

with anxiety, given a prescription for Xanax, and told to return if her symptoms worsened. R. 304.

The next day, on March 19, 2010, plaintiff saw Dr. Oczko-Walker and told her about the two recent family tragedies. R. 326. Dr. Oczko-Walker prescribed a low dose of Lexapro and arranged for Angela Miller, a social worker counselor, to talk with plaintiff. R. 327. Dr. Oczko-Walker also noted that plaintiff's "mouth movements from dystonia have improved." *Id.*

On April 27, 2010, plaintiff told Dr. Oczko-Walker that "counseling helps," that she "has been doing better," that she is "more at peace" and has "less anxiety," that her friends have told her that "she looks less stressed out," and that she "has actually put [in] applications for work at River Bluff." R. 325. Dr. Oczko-Walker concluded that plaintiff's dystonia was "very stable and actually improving, " that plaintiff had "less jaw opening and sub-protrusion movements," and that she had only one panic attack since March 2010. R. 325-26.

On May 26, 2010, plaintiff filed her application for disability insurance benefits, as well as an application for disabled widow's benefits. R. 83.

On July 27, 2010, plaintiff again saw Dr. Oczko-Walker who noted that plaintiff's dystonia was "stable and actually improved." R. 352. As for the psychological issues, she noted that plaintiff had "been doing better with her grief and posttraumatic stress disorder symptoms" caused by her husband's suicide; that plaintiff was "benefitting from every 2-week counseling"; and that her prescriptions for Lexapro and Xanax were "helpful." R. 351-52. This appears to have been plaintiff's last visit with Dr. Oczko-Walker. According to the ALJ's opinion, plaintiff stopped seeing Dr. Oczko-Walker because plaintiff could not afford further treatment.

In September 2010, plaintiff was examined by consultative examiner Gerald Hoffman, a psychiatrist, who diagnosed her with "Alleged Adjustment Disorder With Anxiety and

3

Depressed Mood secondary to the death of her husband and significant others." R. 356. Dr. Hoffman noted: "Her disturbed affect, and [its] behavioral manifestation, is expressed only when she describes her memory. When focused on neutral thoughts, or otherwise engaged in purposeful activity, the disturbed affect is not objectively present. Anticipatory anxiety limits her seeking employment." R. 357.

At some point, plaintiff began treatment at the Crusader Clinic.[2] Her primary physician was Dr. Arvin Silva, who referred plaintiff to a new neurologist, Dr. Simonescu, who saw plaintiff several times and concluded that her "dystonia was clinically improved and [her] head movements stopped with distraction and reassurance." R. 90. Dr. Simonescu "believed [muscle spasms] were caused by anxiety and stress, and possibly suggestive of a somatoform disorder" and urged plaintiff to seek counseling. R. 90-91. In March 2011, plaintiff was treated for depression, anxiety, and PTSD symptoms by the Janet Wattles Clinic. R. 91. Plaintiff also received therapy and medication management with Michael Kuna, a psychiatrist. R. 91.

In June 2011, plaintiff went to the emergency room. She had cut her arm, and told doctors that she tried to cut it off because it was the arm that touched her husband's body when she found him hanging. She stayed overnight and was diagnosed with depression and released. Afterwards, she told Dr. Kuna that she was doing better, stating that she had a new boyfriend who made her laugh. Plaintiff's counseling at the Janet Wattles Center ended in September 2011 because she was "currently stable" and "no longer needs" counseling. R. 405, 443.

On February 16, 2012, the ALJ conducted a hearing. Plaintiff testified that she was currently living with her new boyfriend and his daughter, that she drives on average five times a week to see her grandchildren and her brother, and that she has panic and dystonia attacks that

---

[2] Plaintiff's opening brief does not describe many of her doctor visits. Accordingly, the Court's summary relies heavily on the ALJ's opinion and the Court's own review of the record. This summary does not purport to describe every doctor visit, but merely provides background and context for the arguments that follow.

4

sometimes make her get in a closet to settle down. The ALJ asked plaintiff about Dr. Oczko-Walker's conclusion that plaintiff was improving in 2010, a fact the ALJ seemed to view as inconsistent plaintiff's attorney's opening statement claiming that the dystonia was worsening over time. R. 27, 33. Plaintiff did not give a clear answer, but disputed Dr. Oczko-Walker's conclusion. R. 34. Plaintiff did not feel she could work because she jerks "all the time from the dystonia" and believed she would be fired if anyone found out. R. 32. She testified that if she tries to go someplace, the jerking will start. She has crying spells "at least twice a day" and thinks constantly about her husband's suicide and what she could have done to prevent it. R. 43-44. She described her typical day as follows: "Whenever I finally get out of bed, then I go in the living room and sit down, and I just sit there." R. 46. She helps her boyfriend with the cooking and does laundry, but her boyfriend's daughter does the dishes. She "just joined the Y, because Dr. Silva wants [her] to walk." R. 48. She goes out to eat and has taken her grandchildren to the movie once, to the park several times, and will take them to the store if they need something.

The above testimony was elicited by the ALJ. Plaintiff's counsel asked additional questions. The following exchange is a critical piece of evidence, according to plaintiff:

Q. [By plaintiff's counsel] Ms. Weaver, could you tell us how often you have your jerking attacks?

A. A week[?]

Q. Like, do you have them daily, or do you have them so many times a week, or so many times a month?

A. Right.

Q. Just to give us an approximation of how often they happen.

A. I would say that I probably have them seven times a week.

Q. And how long do they last?

5

>    A. It depends how bad it is, for how long it lasts.
>
>    Q. Okay.
>
>    A. You know, like, I've had one, I think, that lasted maybe five minutes. When I went and seen Dr. Silva the other day and then talked to the counselor, that one lasted over an hour.
>
>    Q. Is there anything that triggers these attacks, from what you can tell?
>
>    A. Well, I know stress does. But that's the only thing I can figure out.
>
>    Q. Is there anything that you do to try to prevent them?
>
>    A. Well, I try to stay away from stress, and I just stay home.

R. 50-51. She testified that she takes Xanax to help with the attacks and feels drained and exhausted after them. Plaintiff then indicated that she was having problems that very moment while testifying, apparently having some sort of an attack during the hearing. The ALJ then went off the record to allow plaintiff to get some water. It is not clear how long this lasted, but plaintiff resumed her testimony, describing her daily activities and smoking habit.

An impartial psychological expert, Ellen Rosenthal, testified that the objective medical evidence did not support plaintiff's testimony. She noted that plaintiff reported that counseling helped by making her less anxious. Dr. Rosenthal also noted that plaintiff reported to the consultative examiner that she had sometimes felt panicky and gone into a closet but "she hadn't done this in the past two to [] three months." R. 61. Dr. Rosenthal noted that the consultative examiner's reports were consistent with plaintiff's own testimony that, when she sits at home and thinks, she has negative thoughts but that "if she is purposefully engaged, that these obsessive thoughts significantly diminish." R. 61. Dr. Rosenthal concluded that plaintiff had a "favorable response" to both medication and counseling. R. 63.

6

After the hearing, plaintiff continued to be treated by Dr. Silva who completed a questionnaire (Ex. 14F), discussed below. In April 2012, plaintiff was treated by neurologist Farouk Khan, the third neurologist she had seen in three years. He diagnosed her with dystonia and increased her Flexeril dosage.[3] In August, additional evidence was submitted to the medical expert, Dr. Rosenthal, who gave a slightly updated opinion, which is also discussed below.

On November 28, 2012, the ALJ found plaintiff not disabled. The ALJ found that plaintiff had the following severe impairments: mild dystonia, a history of elevated heavy metals, major depressive disorder, bereavement, an anxiety disorder, and posttraumatic stress disorder. The ALJ found that plaintiff did not meet any listing, a conclusion plaintiff does not challenge now. In the RFC analysis, the ALJ concluded that plaintiff could perform medium work, except that she was limited to "simple and detailed, but no complex tasks," without "fast-paced production quotas" and without any "regular contact with the general public." R. 87. The ALJ's explanations are examined more closely below, but the ALJ generally found that plaintiff's psychological and neurological problems improved over time. The ALJ found that plaintiff's subjective complaints were "not entirely credible" and "not fully supported" by the objective evidence. R. 93.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v.*

---

[3] Plaintiff does not refer to these visits in her briefs, presumably because she does not believe they help her argument for being found disabled.

*Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Although plaintiff raises a handful of arguments, her primary one is that the ALJ "failed to make a finding as to the severity and frequency of [her] dystonia and panic attacks." Dkt. #14 at 7. Plaintiff describes this as the "central issue" in this case. *Id.* More specifically, she complains that the ALJ failed to address two discrete factual claims: (1) she sometimes has panic attacks causing her to hide in a closet, and (2) she has approximately seven dystonia attacks a week. She believes these two problems prevent her from working full time. The Court is not persuaded by this argument because it fails to account for the broader rationale and specific reasons the ALJ provided to support the decision.

One preliminary observation should be noted at the outset. It is not clear whether plaintiff is claiming that her dystonia and panic attacks were separate. In several places, she makes general statements implying they were distinct events. *See, e.g.*, Dkt. # 14 at 8 (ALJ did not "account for *either* Plaintiff's dystonia attacks *or* her panic attacks") (emphasis added). Her two factual claims—hiding in the closet and seven weekly attacks—seem to rest on such a distinction. There also have been two separate causes posited for her problems, one psychological related to her husband's suicide and the other neurological caused by (possibly) heavy metals. At the same time, plaintiff has often described her attacks as if they were involved a combination of muscle spasms and stress. For example, plaintiff told one doctor that "she shakes and will at times go into the closet when fearful." R. 407. She also has stated that her

dystonia attacks were worsened by stress, again suggesting a combined attack.[4] In her opening brief, plaintiff has attempted to avoid this issue by asserting that it does not matter whether the cause of her problems was psychological or neurological because the focus during the RFC analysis should be on her functional limitations. Having noted this issue, the Court will follow plaintiff's framework and consider each factual claim independently.

The Court first considers plaintiff's claim about the panic attacks. Here is how she frames the argument:

> [T]he ALJ failed to address Plaintiff's panic attacks during which she hides in a closet until found. *See* (AR 303, 407, 478). The ALJ listed depression, bereavement, anxiety, and PTSD among her severe impairments. (AR 86.) Plaintiff testified that, as part of her symptoms, she sometimes feels overwhelmed and hides. (AR 37.) The ALJ never discussed that statement. The ALJ also failed to make a finding of how often those attacks occur and failed to ask the VE about probable off-task time.

Dkt. #14 at 9-10. This argument is unavailing because, as the Government correctly points out, the ALJ acknowledged this evidence "throughout the decision." Dkt. #19 at 5-6; *see* R. 90 (noting that plaintiff "complained of mood swings, PTSD symptoms, and behavioral issues, such as hiding in her closet."); R. 91 (noting that plaintiff "admitted to occasionally hiding in the closet out of fear, social isolation, and preoccupation with death"); R. 92 (noting that plaintiff "reported panic attacks, jerking movements, and hiding in a closet to calm down"). In short, plaintiff's premise is simply false.

Although the ALJ did not discuss this evidence at great length, it is evident from the above references that she did not view these episodes as being a frequent occurrences. For

---

[4] Her doctors also wrestled with this causal question but never, insofar as this Court can tell, gave a definitive answer. Plaintiff was several times referred to neurologists who, after a period of treatment, suggested she seek psychological counseling. Dr. Simonescu speculated whether plaintiff's dystonia problems ultimately were more psychological than neurological. R. 90-91 (ALJ's summary: "Dr. Simonescu noted that her dystonia was clinically improved and the claimant's head movements stopped with distraction and reassurance. [Dr. Simonescu] believed they were caused by anxiety and stress, and possibly suggestive of a somatoform disorder.").

9

example, she used the word "occasionally" in referring to them. Moreover, as discussed below, the ALJ concluded that plaintiff's problems improved over time with counseling and medication, and there is evidence both in the record and introduced at the hearing showing that these attacks were not frequent and, in fact, diminished over time.[5] The citations provided by plaintiff (R. 37, 303, 407, 478) do not support her claim that she frequently hid in a closet or, if she did initially, that this problem continued after she received therapy and medication. Plaintiff has not taken a clear position as to how frequent she needed to hide in a closet. In the above passage, plaintiff used the vague word "sometimes" without providing a specific number, in contrast to how she described the dystonia attacks. It is thus hard to fault the ALJ for not making a finding about something that plaintiff herself has never carefully articulated. Finally, although the ALJ indicated that plaintiff's problems were improving, the ALJ still included a limitation in the RFC to account for stress and panic.

Plaintiff's other factual claim is that she experienced dystonia or shaking episodes, on average, seven times a week. Here at least, plaintiff can point to one piece of evidence to support her claim regarding frequency. This evidence is her testimony at the hearing, which the Court quoted above.[6] Plaintiff argues that the ALJ failed to address this testimony and had no basis for discounting her credibility. The Government responds that, although the ALJ never specifically commented on the seven-times-a-week testimony, the ALJ made clear that she did not find this testimony credible. Although plaintiff's argument is somewhat stronger than her first one, for

---

[5] *See, e.g.*, R. 61, 92, 355 (in September 2010, plaintiff told Dr. Hoffman, the consultative examiner, that after her husband's suicide, she had panic attacks for the first time in her life and that she sometimes went into a closet to calm down, but that she "has not done this in the past two or three months"); *see also* R. 326 (in April 2010, plaintiff told Dr. Oczko-Walker that she had only one panic attack since being hospitalized in March).
[6] The Court did not come across any reference in the medical records indicating that plaintiff ever told her doctors that her dystonia attacks were occurring with this specific, seven-times-a-week frequency, although she did generally complain about these attacks.

10

several reasons, the Court still agrees with the Government that this argument does not justify a remand.

First, to the extent that plaintiff is suggesting that the ALJ ignored her dystonia attacks in general, this would be a highly misleading impression. The dystonia attacks were the central issue discussed in the opinion, a conclusion any fair reading would confirm. A simple word search indicates that the word "dystonia" was used 16 times in the opinion, the word "jerks" or "jerking" 14 times, the word "tremors" 9 times, and the word "spasms" 3 times. The ALJ recounted many doctor visits, and noted doctor's comments and diagnoses about plaintiff's muscle problems. Other than her assertion that the ALJ ignored this one piece of testimony about seven attacks a week, plaintiff has not complained that the ALJ ignored any of the other voluminous evidence bearing on this issue.

Second, plaintiff's argument ignores the ALJ's overarching rationale. In a nutshell, it was an improvement narrative—namely, that after her husband's suicide and after heavy metal poisoning, plaintiff slowly got better over time until she became—in the words of the ALJ—mostly stable. The ALJ cited to multiple reasons for this conclusion. The ALJ noted that, "[o]nce [plaintiff] moved and stopped using well water, her metal levels also lowered"; that plaintiff had "found some help with grief counseling, which she continued to receive regularly"; that multiple medications were helping; that several doctors noted that plaintiff's tremors and jerks stopped with distraction and purposeful movement; that "by September 2011, [plaintiff] stopped counseling and medication management because she was stable and no longer needed the services"; and that plaintiff reported having fun with a new boyfriend in the fall of 2011. R. 91-93. Notably, in her briefs, plaintiff has not questioned any of these assertions. It is true that some facts—such as, plaintiff's brief hospitalization in the summer of 2011—suggest that

11

plaintiff's improvement was not always a smooth upward progression. But the ALJ acknowledged these facts and offered an explanation. For example, the ALJ noted that, shortly after the hospitalization, plaintiff found a new boyfriend, had a higher GAF score, and stopped counseling. R. 91. Ultimately, it the ALJ's job to weigh and make a judgment about these types of competing evidentiary claims. And the Court is not free to simply reweigh the evidence, which is essentially the whole point of plaintiff's brief. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

Third, contrary to plaintiff's claim that the ALJ failed to address the frequency of her dystonia attacks, the ALJ in fact stated the following: "Additionally, after beginning Sinemet and Artane, the claimant's dystonia seemed to stabilize and improve. Her jerking movements **became less severe and frequent**, and she required no additional or intensive treatment." R. 93 (emphasis added). This conclusion fits with the larger improvement rationale. In light of this finding, plaintiff's argument ultimately boils down to a very narrow and targeted criticism that the ALJ should have made a specific finding as to the exact number of dystonia attacks plaintiff was having on average each week. However, plaintiff has not cited to a case suggesting that the ALJ must make such a precise, fine-grained finding, especially when, as discussed herein, the Court finds that the ALJ has offered several specific reasons for not finding plaintiff's testimony credible on this issue. *See Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) (an ALJ's credibility determination should be reversed only if it is patently wrong); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning").[7]

---

[7] In their briefs, the parties engage in back-and-forth arguments about whether the ALJ used the correct standard regarding credibility. These arguments are vague and hard to follow. However, as noted above, the key question is whether the ALJ offered "specific reasons" for not finding the plaintiff credible and, if so, whether these reasons are patently wrong. The Court finds that the ALJ met these standards.

12

Fourth, another line of evidence that plaintiff's argument ignores is the medical opinions. The ALJ summarized them and found that they either supported her conclusions or conversely failed to support plaintiff's position. These doctors included state agency physicians, plaintiff's treating doctors, and the impartial medical expert who testified at the hearing. Plaintiff does not raise any argument now that the ALJ erred in analyzing this evidence, or failed to follow the treating physician rule. Among other things, the ALJ noted that plaintiff's "primary care physician, Dr. Silva, completed a Physical Residual Functional Capacity Questionnaire in March 2012, but he offered no opinions regarding the claimant's functional abilities due to insufficient contact with the claimant."[8] R. 94; Ex. 14F. The only argument plaintiff has made in response to this evidence is to note that "[n]o doctor in the record opined she was a malingerer." Dkt. #14 at 8. But the mere fact that none of her doctors were willing, in effect, to call her a liar does not mean that the ALJ then must then accept the opposite conclusion that every one of her claims must be accepted *in toto* without question.

Fifth, yet another reason the ALJ offered for her decision is that she found that plaintiff's daily activities were inconsistent with her alleged symptoms. This inconsistency was another reason for not finding plaintiff's testimony credible. The ALJ noted that plaintiff, among other things, "regularly spends time with family, she is able to drive without difficulty five times per week, and she is able to take her grandchildren to the movies and the park." R. 93; *see also* R. 89 (noting that plaintiff "recently joined a gym with her boyfriend to begin walking"); R. 94 (noting that plaintiff's improvement after June 2011 was consistent with her "ability to be in public places, such as restaurants, the movies, or the park with family members"). In contrast to this fairly wide range of regular activities outside the home, the ALJ noted that plaintiff testified that

---

[8] Presumably, Dr. Silva would have been aware of the frequency of plaintiff's dystonia attacks, yet he was not willing to answer questions such as whether plaintiff would "sometimes need to take unscheduled breaks during an 8-hour working day." R. 491.

she "avoids leaving the house so she does not have [dystonia] attacks in public." R. 88. Plaintiff argues that the ALJ over-relied on her daily activities. However, because the ALJ offered multiple reasons for the overall conclusion, it was not improper to consider this discrepancy regarding daily activities as one factor in assessing plaintiff's credibility. *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) ("So long as an ALJ gives specific reasons supported by the record, [the reviewing courts] will not overturn [the ALJ's] credibility determination unless it is patently wrong.").

In sum, the Court finds that the ALJ relied on substantial evidence, discussed the relevant lines of evidence, acknowledged counter-evidence, and explained the path of her reasoning. Therefore, the Court finds that a remand is not warranted based on the argument that the ALJ should have made a specific finding about the frequency of her panic and dystonia attacks. As noted above, plaintiff referred to this as the central issue. Her remaining arguments, some of which have already been considered, are less developed and need only be addressed briefly.

Plaintiff raises a series of objections about the questions posed to the vocational expert. She first asserts that the questions were incomplete because the ALJ did not include certain limitations, but as the Government argues, the ALJ is only required to include in the hypotheticals those limitations she finds are credible, and the ALJ did not find these limitations credible. Dkt. #19 at 11-12 (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009)). Relatedly, plaintiff complains that the medical expert reviewed certain evidence after the hearing and gave a supplemental opinion. However, as the Government argues, the additional opinion does not contradict anything in the expert's earlier opinion. *See* Dkt. #19 at 12 (describing and comparing two opinions). Plaintiff next complains that the ALJ failed to limit her analysis at Step Four to plaintiff's past *relevant* work, arguing that her previous jobs were either too

temporary or did not pay enough to meet the standards for "substantial and gainful activity" (SGA). Dkt. #14 at 11. The Government agrees with the plaintiff that the ALJ improperly relied on this past work, but argues that any error is harmless because the vocational expert also testified that someone with plaintiff's RFC could work as a dishwasher, janitor, or laundry laborer. Dkt. #19 at 13. In short, the Government argues that the ALJ necessarily would reach the same result on remand. This Court agrees. In her reply, plaintiff argues that the ALJ still should be forced to consider this issue on remand; however, plaintiff never challenges the substance of the argument that the vocational expert found plaintiff could work these other jobs.

Finally, plaintiff complains that the ALJ noted that plaintiff "did not follow through with treatment recommendations to stop smoking, and she admitted to not always taking her medications as prescribed." R. 93. Plaintiff believes that the reference to smoking contradicts *Rousey v. Heckler*, 771 F.2d 1065, 1069-70 (7th Cir. 1985) because there is no evidence that, if she quit smoking, she could work full-time. However, plaintiff's smoking was cited as a possible cause of her high cadmium level which in turn was cited as a possible cause of her dystonia attacks. There is thus a possible connection. In any event, the ALJ only briefly mentioned this issue and it was not a central part of the opinion. A similar analysis applies to the point about medications. Plaintiff does not dispute that she sometimes did not take her medications, but complains that the ALJ should have inquired further into why she failed to do so. However, in her briefs, plaintiff never comes forward with an explanation to explain why she did not follow through. So it is not clear what evidence the ALJ would consider on remand. Again, the Court finds that this point was such a minimal part of the ALJ's decision that any error is harmless.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date: February 3, 2016          By: _____
                                    Iain D. Johnston
                                    United States Magistrate Judge